RAWLS, Chief Judge.
The Trustees of the Internal Improvement Fund appeal from a final declaratory decree holding that the water bottom of Lake Hancock was included within an oil and mineral lease executed by the Trustees to Coastal Petroleum Company.
The sole question on this appeal is whether Lake Hancock was included within the terms of Drilling Lease No. 224-B as Modified.
In order to construe the lease instrument it is necessary to review the history of same. In 1941 the Trustees of the Internal Improvement Fund believed that there was a possibility of discovering oil in the coastal waters of Florida which could result in royalties to the State. Toward this end they granted exploration contracts containing options to lease to various companies covering the coastal areas on the Gulf of Mexico, but the trustees had previously decided unanimously that they would not accept any applications for exploration contracts in the Atlantic areas north of the northern limits of Monroe County.
On July 29, 1941, Arnold Oil Exploration, Inc., through its president Mr. Arnold, requested an exploration contract covering a Gulf area commencing at the Apalachicola Bay and running to a point below Charlotte Harbor, and he also requested Lakes Okeechobee, Kissimmee, Istokpaga, Tohopeka-liga, East Tohopeliga, Apopka, George, Weir and Lochloosa. These lakes drain into the Atlantic Ocean or are a part of the Atlantic watershed. Pursuant to this request Arnold Oil was granted Exploration Contract #224 covering the coastal area requested but not the requested lakes. This contract granted exploration rights and an option to lease state-owned water bottoms of three classifications:
“OFF SHORE AREAS:
“All water bottoms of the Gulf of Mexico within three (3) leagues (10.36 Statute Miles) of the ordinary high water mark * * *.
“BAYS, SOUNDS, BAYOUS:
“All submerged lands and water bottoms in all bays, sounds, and bayous * * *.
“RIVERS AND LAKES:
“The bottoms of and water bottoms adjacent to any such Rivers and Lakes as are ■ specifically named herein and which flow through natural channels into the Gulf of Mexico, as follows:
“Myakka, Manatee * * * [Naming 24] Peace * * * Rivers.” No lakes are named.
*73 The Contract then classifies the state-owned water bottoms: Class (a) as coastal off shore areas, Class (b) as bays, bayous, sounds, and “Class (c) : Inland waters, shall consist of all rivers and lakes named herein, together zvith all connecting sloughs, arms and overflow lands located in such waters .” (Emphasis supplied.) In specify-, ing the size of each exploration unit it provides :
“An exploration unit in Class (c) shall be limited in area to one river or one lake (except where rivers and/or lakes are within ten (10) miles of one another, in which case all rivers and/or lakes so existing and named herein shall be included in one unit), together zvith all sloughs, and overflow or submerged lands, located therein and connected therewith, owned by the State.” (Emphases supplied.)
Exploration Contract #224 does not mention the word “river” or “lake” in any other place other than those quoted herein. With the exception of the general provision to be included in all contracts,[1] each time the phrase “rivers and lakes” is included it is limited by the words “named herein.”
Six days after the execution of the Exploration Contract the Trustees discussed whether or not the lake bottom areas were a part of Mr. Arnold’s original proposal, and it was their unanimous opinion throughout the negotiations that the lake bottoms were not to be included in the contract of Mr. Arnold and that the Trustees were not then considering leasing any new areas.
In 1942 Arnold applied for an Exploration Contract covering the St. Johns River and 12 designated lakes on the basis of hardship since he had already made tentative explorations in these areas. At a meeting of the Trustees private persons protested leasing Lakes Monroe, Harney, Jessup, and Puzzle and without debate these protested lakes were excluded by the Trustees. Thereupon Arnold was granted a separate contract, No. 248, covering the named lakes, and part of the St. Johns River.
In 1946 there was considerable debate among the Trustees as to whether Arnold was entitled to exercise his option for oil and mineral leases on the property designated in the exploration contracts due to his failure to completely comply with the terms of the contracts. However, pursuant to Exploration Contract #224, Drilling Leases 224 — A and 224 — B were executed after the Trustees heard letters of protest and determined that laws enacted in 1945 were sufficient to control oil wells in a manner which would preserve the valuable beaches of the coastal communities.
Thereafter, Arnold Oil transferred its interest to Coastal Petroleum Company. About the same time litigation between the U. S. and the State of California involving title to oil rights of California Tidewater Lands, threw a cloud on Florida’s title to a portion of the Gulf bottoms covered in the leases 224 — A and B. For this reason and because other provisions of the leases “appear difficult of construction, and require clarification as between the said parties,” Drilling Lease No. 224-B as Modified and Drilling Lease No. 224 — A as Modified were executed on February 27, 1947. These modified leases differed in a number of ways from the Exploration Contract and the original leases particularly in the type of water bottoms to be contained in each drilling block. The modified leases provided for the first time that all state-owned water bottoms of all three classes shall be contained in each specified drilling block.
*74 Drilling' Lease No. 224-B as Modified describes the three types of water bottoms covered as (1) areas of the Gulf of Mexico, (2) bays, sounds and bayous of the Gulf, and (3) :
“Also the bottoms of and water bottoms adjacent to the rivers hereinafter named which flow through natural channels in the Gulf of Mexico, to wit: Myakka, Manatee, Little Manatee, Alafia, Caloo-sahatchee (from its mouth to LaBelle Bridge), Peace River to Township 29/30, ■included within said Drilling Blocks 5, 6, 7 and 8 as shown on said map.” (Emphasis supplied.)
/It was by his construction of this section that the Chancellor found that Lake Hancock was a “water bottom adjacent to” Peace River. We compared the first phrase italicized above with the words from the Exploration Contract wherein it describes the water bottoms covered therein as follows:
“The bottoms of and water bottoms adjacent to only such, Rivers and Lakes as are specifically named herein and which flow through natural channels into the Gulf * * *.” (Emphasis supplied.)
We note that almost the same wording is used except the lease leaves out the words “and lakes,” and it limits the Peace River to the line between Townships 29 and 30, which is a point south of Lake Hancock. In two other places the modified lease refers to the inland water bottoms covered therein. First, in describing what bottoms shall comprise each drilling block, the lease lists (1) Gulf bottoms, (2) bays, bayous and sounds, and (3) “all rivers and lakes named herein, together with all connecting sloughs, arms and overflow lands located in such waters.” (Emphasis supplied.) Secondly, in specifying which drilling block these inland waters will be considered a part, the modified lease stated:
“All rivers, sloughs, arms and overflow lands included in the above blocks are to be considered a part of that particular drilling block into which the respective river, slough, arm or overflow land drains or empties.”
We find it difficult to construe the words “bottoms of and water bottoms adjacent to the rivers hereinafter named” to include Lake Plancock as a portion of Peace River for several reasons.
It is admitted that Lake Hancock is not mentioned in any of the lease documents but is a sovereign body of navigable water meandered by the government and within the jurisdiction of the Trustees. It is also admitted that Lake Hancock is the head-water of Peace River and flows through natural channels into the Gulf of Mexico. Lake Hancock does not flow directly into Peace River. Instead it drains into Cohanzy Creek which flows into Peace Creek which empties into Peace River. The southern portion of Peace River, from its mouth northward to the line between Townships 38/39, is meandered and within the jurisdiction of the Trustees. However, Peace River north of Township 38/39 is not meandered and does not belong to the State. That is, Peace River for a distance of 40 miles south of Lake Hancock is in private ownership.
In all the pertinent documents rivers and lakes are referred to in a context indicating that the parties considered them two separate entities. In that portion of the instruments describing the water bottoms in which the oil and mineral rights are conveyed, in each and every instance where the words “rivers” and “lakes” are mentioned, they are followed by the words “specifically named herein”, “hereinafter named” or words of similar import. Furthermore, these documents contain additional descriptive phraseology that offers a reasonable and logical explanation as to what is meant by the words “water bottoms of and water bottoms adjacent to the rivers hereinafter named.” These explanatory words are “together with all connecting sloughs, arms and overflow lands.” To construe this phrase, which appears twice in both the modified lease and the Exploration Contract, to include a lake which feeds a river would be to defy the ac *75 cepted and usual meaning of the terms chosen by the parties. Webster’s New Collegiate Dictionary defines “arm” as “an inlet of water, as from the sea,” and defines “inlet” as “a recess in a shore; a narrow strip of water running into the land or between islands; * * * That which is let in * * Therefore, since the river' does not back up into or feed Lake Hancock, the lake is not an inlet or “arm” of the river.
We find that oil and mineral rights in Lake Hancock were not conveyed by the lease instruments. Had the contract and lease intended to include all state-owned water bottoms which were connected by natural streams to the named rivers, they could have easily done so rather than using all the additional descriptive words. Furthermore, if no credence is given to the words “Peace River to Township 29/30,” can the lessees also ignore the other limitations contained in the leases such as “Caloo-sahatchee from its mouth to LaBelle Bridge” and “that part of St. Johns River, South of Lake Puzzle?” Our conclusion gives full effect to all words chosen and used by the parties in the contracts.
We do not find the lease sufficiently indefinite to justify relying upon extrinsic evidence. However, the extrinsic evidence introduced is consistent with our conclusion.
The basic premise of the chancellor’s decision hinges upon a letter written by Arnold to the Trustees on October 4, 1941, the day the Exploration Contract was executed, in which he said:
“Your Honorable Board has elected to exclude all lakes and rivers, the waters of which do not drain into the Gulf of Mexico from the contract being executed in our favor.”
The chancellor found that this letter clearly implied that the Exploration Contract of October 4, 1941, did include those lakes which drain into the Gulf. In so holding he overlooked the fact that all the lakes requested by Arnold were those which drained into the Atlantic, and in that year, 1941, the Trustees had already agreed that they would not grant Exploration Contracts in the Atlantic area north of Monroe County,, although they were eager to have the Gul£ areas explored and leased. We find the; wording in the letter indicated that if the; lakes requested by Arnold had been ones draining into the Gulf, the Trustees would have considered such requests as to named lakes on an individual basis; however, no such specific proposal was furnished by Arnold.
The chancellor also relied upon a statement appearing in the Trustees’ minutes concerning an abatement of rentals on lands to which the State’s title was clouded due to the California decision which affected only tidelands. At the Trustees’ request their engineer F. C. Elliott prepared a report to facilitate their determination of the amount of abatement due Coastal under its leases.' This report set forth a judgment estimate of the number of acres contained in each of the same three classifications designated in the Exploration Contract — the third classifications being Rivers and Lakes. The Trustees discussed whether abatement of rentals applied to that classification and decided that it did not. We do not find that this report or discussion adds any insight as to the intent of the parties.
We conclude that the lease documents meant exactly what they said; that is, that the water bottoms covered included only those rivers and lakes named therein. Since Lake Hancock was not named, it was not included; on the contrary, it was specifically excluded by the words, “Peace River to Township 29/30”.
Reversed.
WIGGINTON and CARROLL, DONALD K., JJ., concur.

. In order to protect State Parks the Trustees voted to include a general provision in all contracts providing for elimination of any areas that might conflict with State Park and Forest property. This general provision appears in Exploration Contract #224, to wit:
“It is specifically understood and agreed that this contract shall not apply to any lake, whether named herein or not, lying within, or partially within, the boundaries of any State Park, nor shall this contract apply to those parts of any river or stream, whether named herein or not, within the boundaries of any State Park, nor to the upstream portion of any river or stream passing into or through any such State Park.”